# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**NIGEL THOMAS THORPE,**                              *Chapter 7*
     Debtor                              *Case No. 08-10212-JNF*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Chapter 7 Trustee's Objection to the amended
proof of claim filed by Michael P. Murray, Esq. ("Murray").  The Court conducted an
evidentiary hearing with respect to the Objection on October 4, 2017 and October 5, 2017.
At the trial, four witnesses testified, including Murray, the Chapter 7 Trustee, Harold B.
Murphy, Esq. (the "Chapter 7 Trustee"), Timothy J.  Dacey, Esq., an attorney experienced
in legal ethics, and Nigel Thomas Thorpe (the "Debtor"), and 44 exhibits were admitted
into evidence.  At the conclusion of the trial, the Court directed the parties to submit briefs
by December 8, 2017.  The briefs having been filed, the Court now makes its findings of
fact and rulings of law in accordance with Fed. R. Bankr. P. 7052.

The issue presented is whether Murray is entitled to attorney's fees for services
rendered to the Debtor, even though he was not a party to a written fee agreement with

1

the Debtor, and, if so, whether his claim for fees based upon quantum meruit theory

should be allowed.

## II. FACTS

A. Background[1]

The Debtor filed a voluntary Chapter 7 petition on January 11, 2008.  At the time

he commenced his case, the Debtor was represented by Richard Cutter, Esq.  Attorney

Cutter continued to represent the Debtor in his bankruptcy case until he passed away in

mid-2016.  The Debtor filed an "Application for Waiver of the Chapter 7 Filing Fee for

Individuals Who Cannot Pay the Filing Fee in Full or in Installments" with his petition

which the Court granted.  On March 6, 2008, the Chapter 7 Trustee filed a Report of No

Distribution.  On April 11, 2008, the Court entered an order of discharge, and, several

days later, on April 14, 2008, the Chapter 7 Trustee was discharged and the Debtor's case

was closed.

Approximately three years later, on May 5, 2011, the U.S. trustee moved to reopen

the Debtor's Chapter 7 case, asserting that "[u]pon information and belief, the Debtor

failed to list certain assets on his schedules including, but not limited to, a claim against

Wachovia Bank of Delaware, N.A. and John A. Dunnery, Vice President, Wachovia

Bank," and requesting the appointment of Harold B. Murphy, Esq. as successor Chapter

---

[1] The Court may take judicial notice of its own docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

2

7 Trustee. (The original Chapter 7 trustee was Joseph Braunstein who passed away after the Debtor's case was closed in 2008). The U.S. trustee attached to his motion, a "Memorandum and Order Regarding Cross Motions for Summary Judgment" entered in Thorpe v. Wachovia Bank of Delaware, N.A., C.A. No. MICV 2008-2070, pursuant to which the Middlesex Superior Court, Department of the Massachusetts Trial Court, stayed the action pending before it owing to the existence of a "threshold question as to whether Thorpe is the 'owner' of the claims asserted in the complaint given Thorpe's prior bankruptcy proceeding." On May 5, 2011, this Court granted the U.S. trustee's motion to reopen the Debtor's bankruptcy case.

Shortly after the case was reopened, the Chapter 7 Trustee requested a claims bar date. The Court subsequently issued a "Notice to Creditors to File Claims," establishing September 12, 2011 as the bar date. On September 7, 2011, Murray filed a proof of claim; on January 4, 2016, he filed an amended proof of claim in the sum of $101,165.69 for legal services, secured by a lien pursuant to Mass. Gen. Laws ch. 221, § 50. Pursuant to his amended proof of claim, Murray contends that he is entitled to recover fees under quantum meruit theory.

B. Murray's Representation of the Debtor

Murray testified that he is a practicing attorney currently specializing in criminal defense. In 2007, however, he had a more general practice and was principal of a real estate company, M.P. Murray & Co., Inc. Murray formed that company in March of 2005 for the purpose of conducting real estate sales, development and consulting. Nothing in

3

the articles of organization for M.P. Murray & Co., Inc. referenced the practice of law. Indeed, on business cards he used for his real estate firm, Murray described himself as a "broker" and did not indicate that he was an attorney.

Murray, as noted above, filed his original proof of claim on behalf of the Law Office of Michael P. Murray, Esq. on September 7, 2011. On the proof of claim form, which he signed in his individual capacity, he indicated that the amount of the claim was "1/3 of recovery in MICV 2008-02070 plus costs." The case number, according to Murray, was a reference to a Superior Court action that he had commenced on behalf of the Debtor after the Debtor's bankruptcy case was closed. Murray attached to his proof of claim a "Fee Agreement," dated January 22, 2007. That agreement was set forth on the letterhead of M.P. Murray & Co., Inc. and was signed by Michael P. Murray, Esq. on behalf of M.P. Murray & Co., Inc. It provided that the Debtor retained and employed "M.P. Murray & Co., Inc. (or Affiliated/Designee)" as his agent to represent him with "full authorization to do all things necessary to collect monies due and arising from the foreclosure sale of my property at 16 Hillside Way, Wilmington, MA 01887" (the "Property") for a fee of "One-Third (1/3) of all monies recovered or obtained by settlement or judgment."

As evident from the date of the Fee Agreement, Murray's association with the Debtor preceded the commencement of his bankruptcy case, as well as the commencement of the civil action in the Superior Court. The Debtor's decision to engage Murray stemmed from several solicitation letters. Murray, on October 19, 2006, using the letterhead of M.P. Murray & Co., Inc. and in an attempt to generate business for his real

4

estate company, sent the Debtor a letter "Re: <u>Excess Foreclosure Funds</u>" and included a

business card for M.P. Murray & Co., Inc. in which he referred to himself as "Michael P.

Murray Esq., Broker."  In his letter, Murray represented the following:

> **<u>You are entitled to all excess proceeds from the foreclosure sale of your
> property.</u>**  This money is yours – it belongs to you.  Excess proceeds consist
> of the difference between the amount of money received by the foreclosing
> bank, less the outstanding balance of your mortgage, costs, fees and liens.
> In many cases the amount of excess funds is thousands of dollars. **<u>Our
> records indicate that you may be entitled to receive up to TWO
> HUNDRED SEVENTY THOUSAND DOLLARS ($270,000.00) as a result
> of the foreclosure sale of your property.</u>**
>
> M.P. Murray & Co., Inc. can help you estimate and collect any excess funds
> that are owed to you. . . .

(emphasis in original).  Murray testified that the words "our records" used in the letter

were a reference to public records, "most likely the notice of foreclosure sale."

Murray sent a second solicitation to the Debtor on November 16, 2006.  He

enclosed the same business card and used the stationery for M.P. Murray & Co., Inc.  In

this letter, he stated in part:  "**<u>I believe the bank that foreclosed on your property OWES

YOU money.</u>**  I can help you get this money." (emphasis in original).

As noted above, Murray's solicitation letters were successful and the Debtor

engaged him.  On January 22, 2007, approximately one year before the Debtor

commenced his bankruptcy case, Murray forwarded the Debtor the Fee Agreement,

which the Debtor executed the same day and which Murray attached to his original proof

of claim.  Murray testified that he began performing services on the date the Fee

Agreement was executed by the Debtor, and he continued rendering services to the

Debtor until "the end of 2011, the beginning of 2012" when he withdrew his appearance in the Superior Court action.[2]

The Debtor formally engaged M.P. Murray & Co., Inc. with respect to a foreclosure sale conducted by Wachovia Bank of Delaware, N.A. ("Wachovia"), the holder of a second mortgage on the Property.  On or about August 25, 2006, Wachovia, exercising its statutory power of sale, sold the Property to a third party at auction.  Even though the Property was sold subject to the first mortgage, Wachovia paid $178,626.61 of the auction proceeds to the first mortgagee, Wells Fargo Bank, N.A.  This left a surplus of $74,502.96, excluding any sums eventually recovered through litigation.[3]  Without filing suit and prior to the commencement of the Debtor's Chapter 7 case, Murray recovered for the Debtor the sum of $74,502.96 in excess foreclosure sale proceeds.  The Debtor paid Murray a fee on this recovery of $24,834.32, which was one-third of the excess foreclosure sale proceeds recovered prior to the commencement of the Superior Court action discussed below.

As noted above, the Debtor commenced his Chapter 7 case on January 11, 2008. The Debtor testified that he discussed filing bankruptcy with Murray "in the period of April through December of 2007."  He further testified that he informed Murray that he

---

[2] The Chapter 7 Trustee's motion to be substituted as plaintiff in the Superior Court action was granted on August 17, 2011.

[3] *See* <u>Murphy v. Wachovia Bank of Delaware, N.A.</u>, No. MICV2008-02070, 29 Mass. L. Rptr. 537, 2012 WL 1326642, at *1–2 (Mass. Super. Jan. 23, 2012), reproduced in pertinent part, *infra*.

6

had retained bankruptcy counsel to represent him.  According to the Debtor, Murray

responded by telling him to keep him informed, adding "[h]is instructions were to not

discuss this case with any other attorneys," including his divorce attorney who had made

numerous attempts to obtain an accounting from Wachovia and his bankruptcy counsel.

The Debtor explained:  "[H]e reiterated to me, you know, do not discuss this case with

them. And when I asked him why in that particular case, he said to me, 'When you have

multiple cases and multiple attorneys going concurrently, it just creates more issues,' so

he wanted to keep it separate."

The Debtor, called as a witness by the Chapter 7 Trustee, testified that he advised

Murray when his bankruptcy case was concluded.  Nevertheless, on February 22, 2008,

while the Debtor's bankruptcy case was pending, Murray forwarded the Debtor a copy

of a complaint that he proposed to file on the Debtor's behalf.  In the letter, he stated: "As

previously discussed, I am concerned that this case is aging and the applicable statute of

limitations.  I hope that your *other business* is progressing so that we may file this in the

near future."  (emphasis supplied).  The Debtor stated that he interpreted the phrase

"other business" to mean his bankruptcy case.

On or around May 27, 2008, approximately six weeks after his Chapter 7 case was

closed, Murray, on behalf of the Debtor, filed a six-page, seven-count Verified Complaint

and Demand for Jury Trial against Wachovia and John A. Dunnery, its vice-president.[4]

---

[4] The Verified Complaint contained 15 factual allegations and the following counts:
Count 1: Violation of M.G.L. c. 244, § 35; Count 2: Violation of M.G.L. c. 244, § 14; Count

The Superior Court dismissed the complaint as to John A. Dunnery because Murray did not serve him with the summons and complaint.

The Debtor was deposed in the Superior Court action on April 9, 2009.  Murray testified that he learned of the Debtor's bankruptcy case during that deposition.  The Superior Court docket reflects the filing of cross-motions for summary judgment on January 21, 2011, and, on April 6, 2011, the Superior Court issued a Memorandum and Order Regarding Cross Motions for Summary Judgment in which it recognized that the Debtor had filed a bankruptcy case, stayed the action pending before it, including any ruling on the summary judgment motions for 90 days and ordered the Debtor to "immediately notify the bankruptcy court <u>and</u> the bankruptcy trustee in the bankruptcy action of the existence of this lawsuit"  The court also ordered the Debtor to cooperate with the trustee and to report to it after providing the requisite notice.

Approximately one month later, on May 5, 2011, this Court granted the U.S. trustee's motion to reopen the Debtor's Chapter 7 case.  On August 17, 2011, the Superior Court granted the Chapter 7 Trustee's motion to be substituted as plaintiff and Murray's prosecution of the Superior Court action on behalf of the Debtor ceased.

---

3: Breach of Mortgage; Count 4: Unfair and Deceitful Trade Practices, M.G.L. c. 93A; Count 5: Conversion; Count 6: Unjust Enrichment; Count 7: Negligence.  As noted below, the Superior Court dismissed Counts 1, 4, 5, 6 and 7 on January 24, 2012.

C. <u>The Superior Court Action</u>

Following the substitution of the Chapter 7 Trustee as plaintiff, the Superior Court, on January 23, 2012, issued a Memorandum of Decision and Order with respect to Wachovia's motion for summary judgment.[5]   The state court stated the following:

> The following facts are construed in the light most favorable to Harold B. Murphy as the non-moving party.
>
> This case centers around the mortgages on property located at 16 Hillside Way, Wilmington, Massachusetts. The original plaintiff, Nigel Thorpe, owned the property subject to two mortgages. Wells Fargo Bank, N.A. held the senior mortgage dated March 23, 1999; the original lender of which was G.E. Capital Mortgage Services, Inc., and the amount of the loan was $236,000. Wachovia held the junior mortgage dated July 26, 2000; the original lender of which was Advanced Financial Services, Inc. and the amount of this loan, $158,330.
>
> Following the filing for divorce and a temporary restraining order that ordered Mr. Thorpe to leave his home, Mr. and Mrs. Thorpe stopped making mortgage payments around October 2005. In March 2006, Mr. Thorpe defaulted on both mortgages. In April 2006, Wachovia, the junior mortgagee, commenced foreclosure proceedings on the property. Wachovia conducted the foreclosure pursuant to a power of sale clause which reads:
>
>> The proceeds of the sale shall be applied in the following order: (a) to all reasonable costs and expenses of sale, including reasonable attorneys [sic] fees and costs of title evidence; (b) to all sums secured by this Mortgage; and (c) the excess, if any, to the person or persons legally entitled thereto.
>
> On July 25, 2006, Wachovia conducted a foreclosure auction on the Property. A third-party bidder, the Coniston Group, Inc., placed the winning bid of $420,000. The buyer's attorney served as the settlement agent, and on August 24, 2006, disbursed $231,373.79 to Wachovia through

---

[5] The Superior Court docket does not reflect a final disposition of the Debtor's motion for summary judgment, although it can be inferred that it was denied by virtue of the Superior Court's April 6, 2011 order.

its loan servicer. The next day, the parties closed the sale of the property through a foreclosure deed by corporation.

The buyer's attorney then disbursed $178,626.61 of the sale proceeds to Wells Fargo, the intended purpose of which was to pay off the senior mortgage. However, Wachovia sold the property subject to that encumbrance because it was the junior mortgagee. The purchase price reflects Coniston's knowledge of the senior mortgage, which was recorded in the Middlesex Registry of Deeds, because the final sale price was $420,000, despite the property's appraisal for $690,000 shortly before the foreclosure.

On January 23, 2007, Mr. Thorpe, through Attorney Murray, demanded $270,000 plus treble damages under G.L. c. 93A from Wachovia relating to the foreclosure sale. On March 12, 2007, Wachovia paid Mr. Thorpe $64,502.96 (deemed excess funds from the sale), plus Coniston's $10,000 deposit, totaling $74,502.96. Mr. Thorpe accepted the money.

On January 11, 2008, Mr. Thorpe filed a voluntary petition under Chapter 7 of the U.S. Bankruptcy Code. In that case, Mr. Thorpe filed schedules of all assets and liabilities, but failed to disclose his claim against Wachovia. Based upon Mr. Thorpe's representations, the bankruptcy trustee filed a Trustee's Report of No Distribution on March 6, 2008, and that Court discharged Mr. Thorpe of scheduled liabilities totaling $888,000 on April 11, 2007. Five days later, the Court entered an order discharging the Trustee and closing the bankruptcy case.

After his bankruptcy case was closed, Mr. Thorpe verified the complaint in this action and filed the claims through Attorney Murray on June 4, 2008. However, in a Memorandum and Order regarding motions for summary judgment, a prior session judge determined that Mr. Thorpe was not the true owner of the claims. Mr. Thorpe was obligated to list his assets, including the putative claim against Wachovia, in his bankruptcy action. Because he did not do so, by operation of 11 U.S.C. § 554(c) and (d), the claims remained property of the bankruptcy estate. As such, Harold B. Murphy, the Chapter 7 Trustee of Nigel Thorpe, moved to be substituted as the plaintiff. That motion was allowed on August 13, 2011. Mr. Murphy now brings this claim in place of Nigel Thorpe.

<u>Murphy v. Wachovia Bank of Delaware, N.A.</u>, No. MICV2008-02070, 29 Mass. L. Rptr.

537, 2012 WL 1326642, at *1–2 (Mass. Super. Jan. 23, 2012) (footnotes omitted).  Based

upon the foregoing findings, and applicable law relating to mortgage foreclosures, *see*

Mass. Gen. Laws ch. 24, §§ 36 and 14, as well as other pertinent state statutes and laws,

the Superior Court granted Wachovia's motion for summary judgment as to Counts 1, 4,

5, 6 and 7 in their entirety and denied the motion as to Counts 2 and 3.  *See* 2012 WL

1326642, at *5.

Following its ruling on Wachovia's summary judgment motion, the Superior

Court conducted a bench trial.  On June 28, 2013, it entered a Memorandum of Decision

and Order in which it reiterated its factual findings from its summary judgment

Memorandum of Decision and Order.  After consideration of both mortgage foreclosure

law and equitable considerations, including judicial estoppel due to the Debtor's failure

to disclose a potential asset in his divorce action and in his bankruptcy case, the Superior

Court concluded:

> In summary, Mr. Thorpe's dishonesty in the earlier proceedings was
> inexcusable; however, he is no longer a party to this case, and withholding
> recovery on account of his prior misdeeds would only exacerbate the harm
> he has already caused. By the same token, Wachovia should not be "off the
> hook" for its failure to properly apply the proceeds from the foreclosure
> sale in accordance with the clear terms of the mortgage and G.L.c. 183, § 27.
> Though Wachovia argues that no harm was done when it distributed the
> surplus foreclosure proceeds to Wells Fargo, the bankruptcy trustee
> correctly observed that if Wachovia had properly given the surplus to the
> mortgagor, as opposed to using the funds to pay off a secured creditor
> (Wells Fargo), the payment likely would have resulted in an increase in the
> value of the bankruptcy estate and, in turn, a larger recovery for Mr.
> Thorpe's additional creditors in the bankruptcy proceeding. . . .

11

> [A]fter applying the foreclosure proceeds to its own mortgage and the costs
> of foreclosure, Wachovia was required by the terms of the mortgage and by
> statute to disburse the remainder of the proceeds to the mortgagor, Nigel
> Thorpe. It erroneously permitted the remainder of the surplus to be
> disbursed to the senior mortgagee, Wells Fargo. In doing so, Wachovia
> deprived Mr. Thorpe of his legal right to the funds. Wachovia already
> provided Mr. Thorpe with $74,502.96 of the excess from the foreclosure
> proceeds, but the remaining balance due to Mr. Thorpe is $178,626.61.

Murphy v. Wachovia Bank of Delaware, N.A., No. MICV2008-02070, 31 Mass. L. Rptr.

267, 2013 WL 3778144, at *5 (Mass. Super. June 28, 2013), aff'd, 88 Mass. App. Ct. 9, 36

N.E.3d 48 (2015).  The court thus stated that it would enter judgment for the Chapter 7

Trustee and against Wachovia in the sum of $178,626.61, plus interest in the amount of

$108,938.72 and costs.  On August 13, 2015, the Appeals Court affirmed, holding that

Wells Fargo Bank, N.A. as senior mortgagee was not entitled to the surplus funds; that

the doctrine of unclean hands did not bar the Chapter 7 Trustee from seeking damages;

and that the Chapter 7 Trustee was not judicially estopped from seeking those damages.

See Murphy v. Wachovia Bank of Delaware, N.A., 88 Mass. App. Ct. 9, 36 N.E.3d 48

(2015).

     D. The Reopened Bankruptcy Case

     After the Debtor's Chapter 7 case was reopened in May of 2011, as noted above,

Murray filed a proof of claim that was based upon the contingency Fee Agreement that

M.P. Murray & Co., Inc. had entered into with the Debtor.  On September 28, 2011, he

filed a Notice of Lien pursuant to Mass. Gen. Laws ch. 221 § 50 in the Superior Court.

Murray testified that he could not remember the rules of professional conduct relating to contingent fee agreements that existed in early 2007.

In the Debtor's bankruptcy case, Murray filed, on December 9, 2015, "Original Plaintiff's Counsel, Michael Murray's Request for Award of Reasonable Attorney's Fees and Costs (Opposition to Objection of Chapter 7 Trustee to Claim of Michael P. Murray, Esq.)." At a hearing on Murray's Request, the Court directed Murray to file an amended proof of claim, adding "[t]he Trustee's objection (Doc. #80) shall apply to the amended proof of claim. The Court deems this to be a contested matter to which Part VII of the Fed. R. Bankr. P. apply and shall issue a pre-trial order upon the filing of an amended proof of claim." On December 15, 2015, Murray filed "Original Plaintiff's Counsel, Michael Murray's Request for Award of Reasonable Attorney's Fees and Costs II (Opposition to Objection of Chapter 7 Trustee to Claim of Michael P. Murray, Esq.) [and] Response to: The Affidavit of Nigel Thorpe." On January 4, 2016, Murray filed an amended proof of claim.

With respect to his amended proof of claim, Murray testified: "The quantum meruit theory is that it -- I'm entitled to as much as I deserve, which is the time I had spent on the case over five years of prosecuting it, the results that I achieved prior to handing the case over to Murphy & King." Murray, in addition to setting forth a claim in the amount of $101,165.69, asserted that the claim was fully secured based upon Mass. Gen. Laws ch. 221, § 50 and a "Value of property" of $370,632.03.

13

E. <u>The Disclosure of the Claim</u>

Murray testified that the Debtor did not give him permission to report his claim against Wachovia to the bankruptcy court, although he requested permission "[m]ultiple times in writing, via regular mail, email and Certified Mail."  In addition, Murray asserted that he did not learn of the Debtor's bankruptcy case until his deposition in the state court action which took place on April 9, 2009.

Although Murray learned of the Debtor's bankruptcy petition at a deposition conducted in conjunction with the Superior Court action on April 9, 2009, he waited over a year to direct the Debtor to disclose the claim against Wachovia in his bankruptcy case. After learning about the Debtor's bankruptcy case at the deposition, he neither asked the Debtor the name of his bankruptcy attorney nor examined the Bankruptcy Court docket. He also did not ask the Debtor the name of the Chapter 7 Trustee.

Murray finally wrote to the Debtor on December 15, 2010 stating that "[i]n the event you identified this claim to the Bankruptcy Court you must immediately provide me with the document revealing the same."  He added that it was his "fervent belief" that the Debtor should formally disclose the claim to the Bankruptcy Court "in writing, as soon as possible." Prior to that communication, the Debtor, however, testified that his efforts to speak with Murray had not been successful.

On December 17, 2010, Murray wrote the Debtor a letter strongly suggesting a course of action as follows:

> After you have consulted Bankruptcy counsel and with your Bankruptcy counsel's representation, it is my fervent belief that you should formally disclose this claim to the Bankruptcy Court, in writing, **as soon as possible**. I request that you allow me to establish immediate contact with the Bankruptcy Court, Trustee and/or other personnel in light of the item '1)' [sic] in your email, I would recommend that you engage alternative Bankruptcy Counsel.

The Debtor responded, by email dated December 18, 2010, stating that his bankruptcy attorney advised him to dismiss his case against Wachovia. Curiously, he added: "I still believe that my bankruptcy filing did not cover this case. I would like to discuss this further with a bankruptcy specialist." Following that email, Murray reiterated his advice in another letter to the Debtor, dated December 20, 2010, which he sent by certified mail. In addition, he addressed the Debtor's contention that his bankruptcy attorney [Richard Cutter, Esq., now deceased] did not believe he had any chance of recovering any money with respect to the claims against Wachovia and advised the Debtor to dismiss the state court case. Murray opined that Debtor's counsel may have been professionally negligent and the Debtor would be blameless for failing to disclose the claims.

Murray wrote to the Debtor again on January 26, 2011 "to address the critical issues concerning your bankruptcy and divorce raised by defense counsel over the last month," adding "[a]s you know, counsel for the defense has raised the significant issue that you failed to notify the Bankruptcy Court or the Probate Court of this claim and, therefore, you are prohibited from pursuing this claim as a result of this failure."

Murray letters to the Debtor followed his communications with Timothy J. Dacey ("Dacey"), an attorney serving on the Massachusetts Bar Association Committee on

15

Professional Ethics, which has an advisory service for attorney members.   Murray

testified that, on December 14, 2010, he reached out to Dacey after becoming aware that

Wachovia was intending to file a motion for summary judgment raising the issue of the

Debtor's nondisclosure of his claim against it.   Murray testified:

> [W]e [Murray and Dacey] came to the conclusion that if there was [sic]
> money available it was my ethical obligation to report these monies after I
> attempted to convince Mr. Thorpe to voluntarily report these funds to the
> Bankruptcy Court.
>
> Mr. Thorpe refused and as a result of advice from Attorney Dacey at the
> Bar Ethics Committee I then contacted Joseph Braunstein on three separate
> occasions: April 15th of 2011 via Certified Mail, 7009 1410 001 8510 5545; at
> April 19, 2011 and that was an email -- via email; and then April 25th of
> 2011. During those -- the -- as part of those notifications and during that
> same period of time I had also sent Certified Mail to the clerk of the
> Bankruptcy Court identifying this cause of action and I believe the notice to
> the clerk was the same as to Mr. Braunstein. It would have included a copy
> of the complaint so that they would have all of the identifying information.[6]

Murray denied advising the Debtor not to disclose his claims against Wachovia; he

denied advising the Debtor to delay filing the excess foreclosure proceeds claim in the

state court until after the conclusion of the bankruptcy case.

Dacey, in corresponding with Murray, indicated that the MBA Committee on

Professional Conduct did not give advice about issues of substantive law.   In an email,

dated December 22, 2010, Dacey confirmed that he gave gratuitous ethical advice to

_____

[6] The Court takes judicial notice that the docket in the Debtor's bankruptcy case does not
reflect any entries between April 16, 2008 and April 20, 2011, the date when the Clerk's
Notice from the Superior Court was filed in the Debtor's bankruptcy case referencing the
state court's Memorandum and Order Regarding Cross Motions for Summary Judgment.

16

Murray by telephone on December 15, 2010 and noted that he understood that Wachovia was claiming that the Debtor perjured himself by failing to disclose his claim against it in the bankruptcy court. He stated: "*[r]ecently, counsel for defendant bank informed you that the client filed a bankruptcy petition in 2008* and neglected to disclose the claim against the bank to the Bankruptcy Court." (emphasis supplied). Dacey referenced various rules of professional conduct, including Rule 1.2(c)[7] and Rule 3.3(a)(2), adding that "[i]n my judgment, if the client did not in fact make the required disclosure to the Bankruptcy Court and if as a matter of bankruptcy law the claim does not currently belong to the client, then his pursuit of the claim would be fraudulent." He also opined, citing Rule 3.3, Comment 2(A) and Commonwealth v. Mitchell, 438 Mass. 535, 546 (2003), that "[i]f your client fails to take steps you recommend to resolve the bankruptcy issues, then you may be required to make further disclosures yourself."

On January 27, 2011, Murray wrote to Dacey, thanked him for his December 22, 2010 email, and stated that he had advised the Debtor that pursuant to Rules 1.6(b)(3) and 3.3(a)(2) he was required to make disclosures directly to the courts. He also reported that the Debtor responded by stating that "he had done nothing wrong, that no disclosure was made on advice of his counsel in the Bankruptcy and Divorce Matters, but that instead of making the required disclosure, he was considering dismissing the case." In a letter dated February 1, 2011, Dacey stated "revealing information about your client's

---

[7] Dacey indicated that this reference contains a typo and should be a reference to Rule 1.2(d).

claim to the Bankruptcy Court is discretionary," adding that "[a]n initial question that you must consider is whether, by disclosing the claim to the Bankruptcy Court, you reasonably believe that you can prevent substantial injury to the financial interests of others, in the case the client's creditors."

The claim against Wachovia was disclosed only after the Debtor was ordered to make the disclosure by the Superior Court.  Indeed, on April 20, 2011, this Court's docket reflects receipt of a "Clerk's Notice" from the Superior Court relating to the April 6, 2011 Memorandum and Order requiring the Debtor to immediately notify the Bankruptcy Court and the bankruptcy trustee of the existence of the Superior Court action.

F. <u>The Chapter 7 Trustee's Testimony</u>

The Chapter 7 Trustee testified that he and his counsel "quickly determined that there was a claim that should have been disclosed that had merit."  As a result, the Chapter 7 Trustee instructed his counsel to intervene in the Superior Court action.  The Chapter 7 Trustee stated that he successfully opposed Wachovia's motion for summary judgment pursuant to which it had argued that the Debtor's conduct in failing to disclose the claim in his bankruptcy case precluded assertion of the claim against it.

The Chapter 7 Trustee described the extensive litigation that took place following his intervention in the state court case, including preparing appellate briefs, and opposing Wachovia's petition for rehearing in the Appeals Court of Massachusetts.  The Chapter 7 Trustee eventually obtained an execution and was required to take steps to serve it.  According to the Chapter 7 Trustee, "only at the last minute did the bank

18

ultimately agree to pay." Murray was not involved in the litigation after the Trustee was substituted as plaintiff.

The Chapter 7 Trustee testified that he reviewed proofs of claim filed in the case, including the proof of claim filed by Murray. He stated that "he discussed with him [Murray] whether or not he was going to stand on his claim or whether he should perhaps reconsider the amount of the claim that he was seeking in light of the fact that he did not conclude the litigation." The Chapter 7 Trustee also testified that he objected to both the original and amended proofs of claim because the trigger for payment had not occurred and because of Murray's awareness of the bankruptcy case during the course of the Superior Court litigation.

The Chapter 7 Trustee testified that he spoke with the Debtor's bankruptcy counsel and, following those conversations, the Chapter 7 Trustee's counsel, with Debtor's counsel's participation, drafted an affidavit which the Debtor eventually signed. In his affidavit, the Debtor stated that he informed Murray of his pending divorce proceedings and, in 2007, of his intention to file for bankruptcy protection. In addition, he stated under penalties of perjury: "Attorney Murray advised me not to disclose to either my bankruptcy counsel or my probate counsel my claims against Wachovia," adding that "Attorney Murray further advised me to defer commencing a lawsuit against Wachovia until the conclusion of my Chapter 7 bankruptcy case." The Debtor testified that he signed the affidavit voluntarily after reviewing it carefully. He also testified that the contents were accurate and he stood by them. He stated that he was not given any

19

explanation as to why his bankruptcy attorney wanted him to sign the affidavit. With respect to the Debtor's affidavit, the Chapter 7 Trustee testified that he did not believe that the Debtor had a nefarious motive to obtain a distribution from the estate if Murray's claim were to be disallowed.[8]

The Chapter 7 Trustee further described his evaluation of Murray's claim as follows:

> It was a pretty simple claim. It wasn't a difficult claim except -- the only thing that made it difficult was the -- frankly, the failure to disclose the claim in the bankruptcy case and the unclean hands defense that had been -- that -- that the banks focused on as their defense of the legal claim.

In addition, the Chapter 7 Trustee stated that he was not suspicious of the Debtor's affidavit observing the following:

> The timeline and the circumstances regarding the engagement letter and the assertion of the claim in relation to the bankruptcy was inherently suspect. I've been doing this for 30 years and it didn't smell right and the debtor's sworn affidavit confirmed my suspicions.

Nevertheless, the Debtor in an email to Murray in December of 2010 stated:

> I discussed the house foreclosure with my bankruptcy attorney. He did not believe I had any -- I had any chance of recovering any money. In fact, he scoffed at the idea. The bankruptcy attorney did nonetheless add an item in my bankruptcy filing indicating that I may be owed money from the house and my personal possession.

---

[8] The Court takes judicial notice that proofs of claim in the case total $164,739.19, including Murray's proof of claim in the amount of $101,165.69. If Murray's claim were to be disallowed, claims would total $63,573.50. In view of the Chapter 7 Trustee's recovery of damages of approximately $370,000 in the Superior Court action, there is a likelihood that surplus funds would exist for distribution to the Debtor.

20

G. The Debtor's Testimony

As noted above, the Debtor in his affidavit and his testimony indicated that he informed Murray of his decision to file bankruptcy and Murray advised him not to disclose his claim against Wachovia. During the trial, he stated that he had multiple conversations with Murray about not disclosing the Wachovia claim. The Debtor further testified that he told Murray the name of his bankruptcy counsel. The Debtor was asked about the findings of the Superior Court, in particular, the finding that throughout his divorce proceeding, which lasted until June of 2007, he did not disclose his claim against Wachovia and that Wachovia had paid him $74,502.96. He stated:

> We had the final time in court in January of 2007. We never went back to court after that. We never back to court. Had I have gone back to court and filed subsequent financial statements, I would have discussed things on the house, but we'd already had our final court date. We never went back to court after that.

The Debtor added "none of the attorneys involved in the process believed there was anything at all to come from the claim. The house was gone. It was no longer an asset of - - of the court and as far as everybody was concerned, it wasn't there anymore. It was gone." Nevertheless, the Debtor admitted receiving approximately $75,000, paying Murray his contingent fee and, and repaying his brother who had loaned him money, without disclosing the receipt to the probate court or listing the payments on his Statement of Financial Affairs in response to question 2 "Income other than from employment or operation of business" or in response to question 3 "Payments to Creditors."

21

With respect to a claim arising out of the foreclosure, the Debtor also testified that his bankruptcy attorney informed him "in the period of April to December of 2007," prior to the commencement of his bankruptcy case, that "there was nothing there." Later, he testified that he engaged his bankruptcy counsel in November of 2007.

On Schedule B-Personal Property, the Debtor listed "Personal property illegally taken during house foreclosure" with a value of $5,000.00 with respect to "Other contingent or unliquidated claim of every nature, including tax refunds, counter-claims of the debtor, and rights to setoff claims." The Debtor testified that the value ascribed was "a best guess estimate at that point in time of what it was worth."[9]

The Debtor admitted that it was suggested to him in June of 2012 that disallowance of Murray's claim could result in a surplus of Chapter 7 assets and a distribution to him.

H. Attorney Dacey's Testimony

Attorney Dacey testified about his communications with Murray. He stated:

The initial inquiry was an emergency advice [sic]. He needed guidance right away, so I gave him the advice on the telephone and afterwards circulated an email summarizing my advice to the other committee members. The second time I gave him advice, I believe I consulted with the chair of the committee just to make sure that I was citing the right rules. And the third time I gave him advice, I believe that the email of advice was

---

[9] At the section 341 meeting of creditors, the Debtor testified:

In that entry I listed what at the time I believed was the accurate entry for that description. It was intended to cover anything that was illegally taken during the foreclosure. I had property at the house that was taken. It was intended to cover anything to do with the foreclosure and I really didn't believe there was anything there in the -- in the mortgage foreclosure proceeds claim based upon legal advice I'd been given.

22

circulated among all the committee members before it was sent to Mr. Murray.

Dacey testified that if the Debtor had failed to disclose his claims against Wachovia, it was fraudulent to continue prosecuting the claims in the Superior Court without appropriate disclosures in the bankruptcy court. According to Dacey, if the Debtor were not willing to make the requisite disclosures, Murray had the option of disclosing the claim to the bankruptcy court, assuming the claims had substantial value to the bankruptcy estate and creditors.

In 2015, Murray again communicated with Dacey as the Debtor was objecting to the fees he sought from the bankruptcy estate. Dacey testified that Murray raised the issue of whether he could disclose confidential client communications with the Debtor to rebut some of the claims that were being raised by the Chapter 7 Trustee, adding "we advised him that to the extent reasonably necessary to support his fee claim, he could reveal confidential client communications." In an email to Murray dated December 14, 2015, Dacey, referencing Massachusetts Rule of Professional Conduct 1.6(b), informed Murray that a lawyer may reveal confidential information for certain limited purposes and that, in particular, Rule 1.6(b)(5) permits a lawyer to reveal confidential information to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct involving the client. Dacey opined that "[i]n my view, you have permission to disclose communications with your client under Rule 1.6(b)(5) to the extent necessary to collect your fee and to respond to the Trustee's suggestion that may have some complicity with your client in failing to report the claim to the Bankruptcy Court."

23

I. <u>Murray's Time Summary</u>

Murray prepared a summary of time he estimated that he spent representing the

Debtor in the Superior Court action.  Murray testified that he calculated the total sum of

$101,165.69 set forth in his amended proof of claim based upon the estimate of the time

he spent on the case multiplied by $250, his hourly rate for legal services, minus the fee

that he had received from the initial recovery, i.e. $24,834.32.  He stated that he did not

keep time sheets or any contemporaneous time records.

On March 14, 2016, Murray forwarded to his counsel a "summation regarding the

sizable time and effort devoted to this matter over five (5) years of successful prosecution

and zealous advocacy by this office."  Murray set forth a list of services that he performed,

stating "[t]o the best of my addition[,] the above includes 505.75 hours of service."   In

addition, he stated that he believed that he had "completed over 100 hours of additional

file review, research, and analyses" that he had not included.  He concluded:

> Combining the above over the five (5) year period of successfully
> prosecuting this case, I conservatively estimate that I expended between
> Five Hundred and Seven Hundred (500-700) hours on the above matter
> prior to delivering this mature, researched, drafted, discovered and
> documented case to Murphy & King.
>
> I believe under the circumstances my Lodestar should be significantly
> INCREASED.

In his summary, Murray listed 21 categories of services, adding that he had, among

other things, "completed hundreds of telephone calls with all participants (I have

24

documented over 180 letters);" "received and reviewed 100-200 letters or emails);" attended client conferences, and other conferences, including pretrial conferences, and prepared five letters to "Bar Assoc. Committee on Prof. Ethics Between 9 Dec. 2010 and 10 Dec. 2015." Murray also sought compensation for drafting his two Requests for Award of Reasonable Attorney's Fees and Costs (Opposition to Objection of Chapter 7 Trustee to Claim of Michael P. Murray Esq.) and time spent pursuing discovery from the Chapter 7 Trustee and his counsel. Murray, as noted above, concluded that "[t]o the best of my addition the above includes 505.75 hours of service, excluding over 100 hours of additional file review, research, and analyses that I have not included." Murray also sought an increase in the "Loadstar" [sic].

Although Murray seeks fees of $126,437.50, less $24,834.32 previously paid, for a total of $101,630.18 based upon a quantum meruit theory, he testified, as noted above, that he had no contemporaneous time records of services rendered and was only able to produce hand written notes relating to depositions. He was unable to recall whether he prepared the notes in advance or took them during depositions.

Murray set forth in his estimate of the time he spent researching and drafting a motion for judgment on the pleadings, estimating that he devoted 50 hours to that task. He also testified that he thought "the background research on the complaint was spot-on, significant" and "the discovery process was very, very effective." He elaborated:

> At the termination of that deposition or toward the end of that deposition while I was interrogating Mr. Aman, we were finally to get -- we were finally able to get him to basically admit that they had fouled up the closing,

paid off the wrong person and as a result they gave $170,000 of money that belonged to my client to someone else. And that is on Aman deposition, page 114, line 5; page 115, line 5 -- through page 114, line 5 through page 115, line 5. At that point in time the closing attorney had basically admitted that their actions – whether or not it was a violation of a breach of the mortgage or a breach of 244, Section 36, that their actions deprived Mr. Thorpe of $170,000.

Murray filed a motion for judgment on the pleadings in the Superior Court action, which the court denied, on February 17, 2009, "on the basis that factual questions exist that have a bearing on the application of so-called 'black-letter' law."  On January 21, 2011, the parties in the state court action filed cross-motions for summary judgment, which precipitated the Superior Court's order requiring the Debtor to disclose his claims against Wachovia to the bankruptcy court and the Chapter 7 Trustee.  In his opposition to Wachovia's motion which Murray filed on behalf of the Debtor, he cited only one substantive case and failed to address Wachovia's defense based upon the Debtor's failure to disclose his claim against it in his divorce and bankruptcy cases, although Murray filed, but did not serve, an interpleader action in the Superior Court.

Although Murray, in his written estimate of time, indicated that he spent 50 hours researching and preparing the motion for judgment on the pleadings, he indicated during his testimony that that was incorrect.  He conceded that he transposed the time spent on the Debtor's motion for summary judgment with the time spent on the motion for judgment on the pleadings on which he stated he spent only five hours, although he testified he spent 50 hours researching the basis for the complaint.  Murray testified that he spent 45 hours researching and drafting the motion for summary judgment and 35

26

hours drafting a memorandum in support of the motion. Murray also stated that he spent

an additional 40 hours responding to Wachovia's motion for summary judgment. In

addition, Murray testified that he spent 30 hours writing 181 letters; 20 hours for

telephone calls; and 20 hours for reviewing 100-200 letters he received relating to the

litigation. As noted above, he sought fees for communications with Dacey and drafting

his fee application in this case.

## III. DISCUSSION

A. <u>Applicable Law</u>

1. Objection to Claim

In <u>In re Hayes</u>, 393 B.R. 259 (Bankr. D. Mass. 2008), this Court stated:

> Pursuant to Fed. R. Bankr. P. 3001(f), "[a] proof of claim executed and filed
> in accordance with the Federal Rules of Bankruptcy Procedure constitutes
> prima facie evidence of the validity and amount of the claim." *See* <u>In re
> Long</u>, 353 B.R. 1, 13 (Bankr. D. Mass. 2006). *See also* <u>Juniper Dev. Group v.
> Kahn (In re Hemingway Transp., Inc.)</u>, 993 F.2d 915, 925 (1st Cir. 1993). In
> order to rebut the prima facie evidence, the objecting party must produce
> "substantial evidence," and, if the objecting party produces substantial
> evidence in opposition to the proof of claim, rebutting the prima facie
> evidence, the burden shifts to the claimant to establish the validity of its
> claim. <u>Long</u>, 353 B.R. at 13 (citations omitted).

<u>In re Hayes</u>, 393 B.R. at 269. *See also* <u>In re Genesys Research Institute, Inc.</u>, __ B.R. __, 2017

WL 6311674 (Bankr. D. Mass. Dec. 8, 2017); <u>In re Gretag Imaging, Inc.</u>, 485 B.R. 39, 44

(Bankr. D. Mass. 2013).

2. Fee Awards

"In assessing the scope of an attorney's lien for reasonable fees and expenses, the

language of Mass. Gen. Laws ch. 221, § 50, provides that the attorney shall have a lien

"upon his client's cause of action, counterclaim or claim, upon the judgment, decree or other order in his client's favor entered or made in such proceeding, and upon the proceeds derived therefrom." Ropes & Gray LLP v. Jalbert, 454 Mass. 407, 414, 910 N.E.2d 330, 337 (2009).  According to the court in Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 606 N.E.2d 1336 (1993), "an attorney must establish a substantive contractual or quantum meruit basis to recover fees from the client as a predicate to filing a lien. 414 Mass. at 249, 606 N.E.2d at 1342 (citing Elbaum v. Sullivan, 344 Mass. 662, 664, 183 N.E.2d 712 (1962), and Gil–Wal Corp. v. Painewebber, Inc., 734 F.Supp. 566, 567 (D. Mass. 1990) (enforcing attorneys lien under G.L. c. 221, § 50, to secure quantum meruit right of recovery)). Moreover, "an attorney does not waive his right to the lien by voluntarily withdrawing from the representation in certain circumstances." Kourouvacilis v. Am. Fed'n of State, Cty. & Mun. Emps., 65 Mass. App. Ct. 521, 527, 841 N.E.2d 1273, 1278–79 (2006) (citing Phelps Steel, Inc. v. Von Deak, 24 Mass. App. Ct. 592, 593–594, 511 N.E.2d 42 (1987)). "'[I]f, for example, withdrawal occurs because of a breakdown in the lawyer-client relationship, illness of the lawyer, or development of an unforeseen, and reasonably not foreseeable, conflict of interest the attorney's lien remains intact.'" Kourouvacilis, 65 Mass. App. Ct. 521, 527, 841 N.E.2d 1273, 1278–79 (citing Phelps Steel, Inc., at 594, 511 N.E.2d 42). According to the Appeals Court in Kourouvacilis, "[i]n determining whether the circumstances of withdrawal were sufficiently justified to preserve the lien, the critical issue is whether the attorney had "good cause to withdraw." Id. (citations omitted). The

28

right to enforce the lien can be nullified if unethical conduct prejudicial to the client exists. 65 Mass. App. Ct. at 528, 841 N.E.2d at 1279.

"As a general rule, an attorney who is discharged has no right to recover on a contingent fee contract, but thereafter, the attorney may recover the reasonable value of his services on a theory of quantum meruit. Murray v. Rowse, 25 Mass. L. Rptr. 422, 2009 WL 1663972 (Mass. Super. Ct. April 10, 2009) (citing Opert v. Mellios, 415 Mass. 634, 636-37 (1993)). Ethical misconduct, including disregard for the canons of professional responsibility during the course of representation, may preclude recovery in quantum meruit. Murray v. Rowse, 2009 WL 1663972, at *2 (citing Kourouvacilis, 65 Mass. App. Ct. at 532).

B. Analysis

As noted above, the issue presented is whether Murray is entitled to attorney's fees where he was not a party to a written fee agreement with the Debtor, and, if so, whether his claim for fees based upon quantum meruit theory should be allowed. The issue is complicated, in part, because of 1) the Debtor's fraudulent omission of his claim against Wachovia in his bankruptcy schedules; and 2) the Debtor's lack of credibility due to his incentive to rebut Murray's claim because any sizeable reduction in fees payable to Murray will substantially increase the likelihood of a distribution of surplus proceeds after the payment of all allowed claims and administrative expenses to him. Moreover, the timeline associated with Murray's knowledge of the commencement of a bankruptcy case by the Debtor and the Debtor's omission of the claim in his bankruptcy schedules,

strongly suggests that Murray's credibility also is suspect because of his interest in protecting a contingency fee, an interest that may well have clouded his judgment and duties as an officer of the court.

The Chapter 7 Trustee maintains that Murray's claim for fees under a quantum meruit theory must fail because he violated Massachusetts Rule of Professional Conduct 1.5(c) which requires that contingent fee agreements be in writing and must be signed in duplicate by the lawyer and client, except in certain limited circumstances which are not present here. It is undisputed that the only contingency fee agreement that existed was between M.P. Murray & Co., Inc. and the Debtor. The Debtor had no written fee agreement with Murray. The Chapter 7 Trustee, relying upon the Debtor's affidavit and testimony, also references Murray's instruction to the Debtor to refrain from discussing his claim against Wachovia with his bankruptcy and probate attorneys and the decision to commence the Superior Court action only after the Debtor's bankruptcy case was closed, thus either directly or inferentially encouraging the Debtor to conceal the Wachovia claim from the Chapter 7 Trustee who had the exclusive right to pursue the action. In addition, the Chapter 7 Trustee contends that Murray violated Rule 3.3(a)(2) and (b) of the Massachusetts Rules of Professional Conduct[10]  because he failed to take

---

[10] Massachusetts Rule of Professional Conduct 3.3 provides in pertinent part:

(a) A lawyer shall not knowingly: . . .

any action to investigate the Debtor's bankruptcy case from April 2009, when he testified

that he learned of the Debtor's bankruptcy case at a deposition, through December 9, 2010

when he contacted Attorney Dacey and then only when Wachovia indicated that it

intended to move for summary judgment on grounds that the Debtor had failed to reveal

his claims against it in his bankruptcy case and thus was barred from pursuing them in

state court.

Based upon the testimony and exhibits, the Court concludes that the Chapter 7

Trustee submitted substantial evidence to rebut the prima facie validity of Murray's

---

> (2) fail to disclose a material fact to a tribunal when necessary
> to avoid assisting a criminal or fraudulent act by the client,
> except as provided in Rule 3.3(e);  . . .

> (b) The duties stated in paragraphs (a) continue to the conclusion of the
> proceeding including all appeals, and apply even if compliance requires
> disclosure of information otherwise protected by Rule 1.6.

Mass. R. Prof. C. 3.3(a), (b), and (c) [effective until July 1, 2015].  Rule 1.6 provides:

> (a) A lawyer shall not reveal confidential information relating to the
> representation of a client unless the client consents after consultation,
> except for disclosures that are impliedly authorized in order to carry out
> the representation, and except as stated in paragraph (b).

> (b) A lawyer may reveal confidential information relating to the
> representation of a client to the extent the lawyer reasonably believes
> necessary, and to the extent required by Rules 3.3, 4.1(b), 8.1 or 8.3 must
> reveal, such information: . . .

> (1) to prevent the commission of a criminal or fraudulent act that the lawyer
> reasonably believes is likely to result in substantial injury to the financial
> interests or property of another  . . .

Mass. R. Prof. C. 1.6 [effective until July 1, 2015].

31

amended proof of claim for fees based upon a quantum meruit theory.  Because Murray did not have a written fee agreement with the Debtor, he can only recovery on a quantum meruit theory.  Murray's estimate of time spent, however, is grossly inflated and devoid of accuracy.  It is an incredible reconstruction of time and worthless from an evidentiary standpoint.  Accordingly, Murray cannot recovery on a quantum meruit theory based upon his reconstructed time records.

In addition, Murray's failure to act upon learning of the Debtor's bankruptcy case at his deposition on April 9, 2009 precludes Murray from obtaining compensation for his services after that date due to hi ethical violations.  Although Murray testified that the Debtor did not give him permission to report his claim against Wachovia to the bankruptcy court, even though he requested permission "[m]ultiple times in writing, via regular mail, email and Certified Mail," Massachusetts Rule of Professional Conduct 3.3(a)(2) is not conditioned upon the consent of the client.  The Debtor's failure to disclose his claims against Wachovia was fraudulent.  The Debtor's disclosure of "Personal property illegally taken during house foreclosure" with a value of $5,000.00 was inadequate to alert the Chapter 7 Trustee to his claims against Wachovia.  Accordingly, once Murray learned of the omitted asset, he was duty bound to take steps to inform the Chapter 7 Trustee of the Wachovia claim.  As stated above, ethical misconduct, including disregard for the canons of professional responsibility during the course of representation, may preclude recovery in quantum meruit.  Murray v. Rowse, 2009 WL 1663972, at *2 (citing Kourouvacilis, 65 Mass. App. Ct. at 532).

32

## IV. CONCLUSION

In view of the foregoing, the Court shall enter an order sustaining the Chapter 7

Trustee's Objection to Murray's amended proof of claim.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated:  January 25, 2018

33